May it please the court, Thomas Creel representing the Zomi Communications, the appellant in this case. The technology in this case is familiar to the court. It involves complex details of microprocessor design, hardware accelerators, Java virtual machines. The procedural posture is a little bit less complex. This is the second time this case has been in this court over the same term that was construed below that term, a simple enough term to state the word instruction. And it's a question of what that term means within the claims of the patent. In the Zomi 1 prior appeal, the court reversed, sent it back to the court below because of inadequate findings and logic and reasoning to support the decision and gave the court some directions. The first direction to the court was to find the ordinary meaning for a person of ordinary skill and then to use the intrinsic evidence within the patent, the specification, the to look at reasons for allowance that were granted and so forth. And your main argument, if you had to pick one issue that you only on, is that the judge was supposed to use instruction the same way in all of the claims and the defendant claims 30 of 32 were not consistent with the claim instruction definition? Your Honor, I think that would be tied for top argument along with the fact that the court in effect limited the claims to the embodiments that were disclosed in the patent by doing what? He refused to look. He's not one of ordinary skill in the art. He's a lay judge. We all know that. The court has instructed judges in Philip's case, for instance, told them in many cases even a lay judge can understand claims from the perspective of a person of ordinary skill in the art. Here we have claims in subject matter that cover a highly technical field. In showing the inconsistency in the construction that the court was adopting, we attempted to show that there were, as construed, the claims excluded embodiments that one of ordinary skill in the art would have come up with and seen. And the judge rejected that evidence. Why did he reject evidence? Is there anything in the spec that you rely on for that argument? Well, that's an interesting question. The answer is yes, we're relying on the term instruction. It's very broad and broad enough to cover. But nothing else explicitly in the spec that you can cite us. Well, that's correct because if you think about it, you have highly complicated technology. How else does one prove that there are non-disclosed embodiments that are subsumed in the claims without resorting to some assistance? And we know that from teaching to this court that specification is to teach, in particular by example, best mode and other examples. Claims, on the other hand, claim. And they do not have to include all the embodiments. Here the court effectively said that, oh, I'm limiting the patent to just the claimed embodiments, just the disclosed embodiments. That's all I'm going to allow you. And I'm going to reject any suggestion that there are some embodiments out there that would be excluded by my extremely narrow construction of a comment. And your view is that what he should have done in the alternative was to have more expert testimony that he should have relied on to establish that there are non-disclosed embodiments that should have been covered by the claim construction? I think looking, you directed the judge to look at these claims and this word from the perspective of one of ordinary skill in the art. He repeatedly rejected the finding that he used. He did not ever take the finding of who one of ordinary skill is and apply that to the claims. This is clearly, if you look at, and I was quite impressed with the Blue Brief's recitation of the entire patent and highlighting in yellow every use of the word instruction and convincingly showing that the patent repeatedly refers to the conversion of Java into native instructions. So there seems to be a decided effort to use that term in a very careful and confined manner. How would you respond to that presentation? That's a good question, Arthur. I could quite easily. Claim construction is not a counting issue. You don't count up how many times a term is used. No, it's a matter of what does the term mean. It's a very, apparently, careful effort to use a term in a confined manner. And when they wanted to use and to show that the instruction they're talking about is native instruction. There is a presumption, as we know, in the Nystrom v. Trex case, the full panel opinion, that claims are entitled to their ordinary meaning. Here we have ordinary meaning. The court then should look at uses within the patent to determine if there is evidence that the inventor intended the term to mean something other than this broad term. Trex supports our case on all fours. Here, I can see that there are many mentions of instruction. There are many uses of instruction in connection with native instruction. The problem for the defendant here is that that does not explain all of the uses of instruction. And in fact, it leads to numerous inconsistencies within the four corners of the intrinsic record. For instance, the one judge mentioned the inconsistency with respect to claims 30 and 32. We end up… Well, you said numerous, didn't you? Well, numerous. 30 and 32 or 30 and 32, two numerous. Well, actually, they're quite numerous. We've collected them. And the judge's explanation when he was confronted, he even admitted to the judge below, that there was an inconsistency using this narrow construction with claims 30 and 32. And how did he get around that inconsistency? He said, sorry, perhaps he must have just got it wrong. He made a mistake. That's really too convenient an excuse. Well, it was a little beyond that. I mean, there is an argument that this is the downstream effect so that it's not really part of the instruction. The district court also used that, right? And that is a way to reconcile. I will acknowledge that the district court did use that. I will acknowledge that that is at least a superficially attractive explanation. But I think the court must acknowledge that we're not people of ordinary skill such that we can't interpret that. Instead, we have offered declarations of persons of ordinary skill to inform the judge, to make sure he stayed on the rails, if you will. Another concern here, we have all this emphasis on the single word instruction. But instruction doesn't appear alone in the claim. It appears in context. Now, if the district court had instead construed the entire phrase, hardware unit adapted to convert stack-based instructions into register-based instructions, doesn't that suggest that he's reached the entirely correct determination? Because what we're dealing with is not just instructions, but the conversion of stack-based into register-based instructions. And that suggests that he has the order correct. Well, I think it does not suggest that he had it right. The same evil applies. And we know this court has a— What's the evil? Well, the evil is taking a narrow reading, starting off with that. And we have a judge who made a decision below. Well, we're not talking about instructions now. We're talking about stack-based instructions coming in. They're flowing through the instruction encoder and going to the execute phase. And they're becoming register-based instructions. I see. We're back to talking about the preferred embodiment. Precisely. No, we're talking about—I'm reading right from the claim. This is Claim 1, 215-10. All right. As illustrated in the preferred embodiment, which is what the court did. There are other claims as well. But it doesn't solve the problem, because the problem is whether the instructions are stack-based or register-based, they still pass through the decoder and maintain their character. The judge found that after the decoder, there are no more instructions. He said there's something else. There must be something else. There must be control somewhere. But there's really no support for that in the patent. And in saying that, while this is just part of a larger phrase, it doesn't answer the question. It's wrong to say that there's no support. We just saw a minute ago that they make a very clear effort to translate instructions into native instructions. Well, I'll grant you, yes, they do translate instructions from one type to another. But that doesn't answer the question. The question here is, are they still instructions after the embodiment that's shown in Figure 3? That's the issue. And whether you say that instruction is just part of the longer phrase or not doesn't answer that question, because that's the distinction the court needs. The court said, well, whatever they are, they don't exist after the decode stage. And he's referring to the preferred embodiment. That's the problem with it. And I think, in Your Honor's trouble, we do have some cases that point out that where a court is attracted to a simple solution to a case. Here, the court was persuaded, not by me, that this was a simple case that interpreted one word would be the quick solution, and this case would be over. Well, I think the case was filed in 2002, and it's now 2008. And when you send this back, we're still nowhere with the case. I think that you have to construe all of the claims within the context and not pick out one. Why doesn't chopping the native instructions up into smaller pieces change their essential character? Isn't that what this comes down to? Well, when I eat a piece of pizza, is it still pizza in my stomach? No, it changes character, right? I appreciate that. Chop up the instructions into something that becomes something else. But we're back to the issue. Is this a semantical exercise, or is this something that we interpret as a person of ordinary skill? A person of ordinary skill, and it's unrefuted in the record that the court rejected, that a person of ordinary skill would stay and maintain their character. This court, in the earlier decision, as a bobbing of the speed... Pizza doesn't maintain its character, and neither do these instructions necessarily retain their character. They change their chopped up... Well, should they change, but the question is whether they change... Whether they're still instructions, and I think your analogy to pizza is really off the point, Your Honor, with respect to this technology. I understand it, but again, it shows... It's not highly brought out scientific. Maybe we can have someone come and testify about pizza's trans-borderification in the stomach. But the point here is that a person of ordinary skill, we have... How a judge is supposed to decide these things, other than resorting to semantics? Well, the answer is, and this is why this court directed the judge below, determine who a person of ordinary skill is, and with that... And use that definition in order to inform us of the claims, and I see him in my rebuttal time. Thank you. Thank you, Mr. Briel. Your Honor, may it please the court? I think your analogy about the pizza is not far off. This is, in fact, what happens. Instructions, when they come out of the decoder... Sorry, let me rephrase that. Instructions, once they're decoded, have lost their character. They're no longer instructions. And if we step back for a minute and look at how the patent defines the term instruction, how the patent consistently uses the term instruction, it explains right at the beginning that instructions are generated by a compiler. In other words, there's source code that is compiled, and the output of that compiler are instructions. And alternatively, the instructions are generated by the hardware translator. These instructions, then, as the patent explains, make their way to the input of the CPU. In other words, they go to the fetch stage, then they go to the decoder, and are then decoded, and no longer exist in instruction. The patent has instructions. The patent does not refer in any instance to the output of the decoder as instruction. The patent consistently, as trial court found, used the term instruction to refer to the input of the decoder. Well, one of the problems I'm having is you may be right about what the patent doesn't do with respect to instructions, but the claim to instruction here used the term control signal, right? Yes. And so the judge found that what happens before the execute logic is really control signal, and not an instruction, correct? And I couldn't find anything in the specification of the claims that uses the term control signal. You're correct, Your Honor. And that is because if you step back for a minute and take a look, as one of ordinary skill in the art would, at the patent, and try to understand what this patent is really about, it's about taking what used to be the JVM software, replacing it with hardware to accelerate the translation of Java byte codes into instructions that the CPU can understand. And those instructions are fed then from the translator into the CPU. And so that's what the patent is concerned with. It's concerned with that translation and doing it in hardware so there is no need for the patent to refer to the output of the decoder and talk about it in the context of any instructions because everything that's happening that the patent is describing is really up front of the decoder when it comes to the instructions. Well, I guess, but then you're left with the defendant claims 30 and 32. And there they're talking with either of you, as the district court judge seemed to recognize that it's a bit problematic to impose this definition of instruction literally on an instruction of 30. And I understand, Your Honor, yes, and he did address that and he did consider that. And what the judge found that in the abstract, if you look at the claims as Nozomi would have you, in the abstract, you put them on a blackboard and you view them in a vacuum completely apart from the context of the specification. The judge said, yes, the monophore here is still in the art, might see perhaps what Nozomi is seeing. But once you look at the context of the patent, you understand that what we're really talking about is the instructions of this claim 30, where it says execute unit executing the register-based instructions. But what you're really talking about, as the trial court found, is simply the instructions, the execute unit implementing the instructions. But did not the earlier case instruct the district court to use the same definition of instruction in all claims? Your Honor, and in fact, he did. His construction, the result of his construction, means that the term instruction is used consistently throughout the claims, including claims 30 that Nozomi relies on and claim 32. Because if you look actually at the claim 30, what it does is it adds the term execute unit. It depends from claim 1 and 2, and it's really adding a limitation to the CPU. And I think the district court, he said something like, he acknowledged it enough, the literal definition would not work. So he said, well, we don't want to be hyper-literal. I'm not sure what the difference is between literal and hyper-literal. He was cautious in the language he used. But he used, you know, one might read things a certain way, is how he said it. But he said that would make absolutely no sense when you look at this claim in the context of the specification. And in fact, Your Honor, the specification supports the district court's claim construction. When you look at the claim language that Nozomi has also relied on in its brief that talks about the execute logic, executing the native instructions, that's at column 5, line 15 in the patent, that specification explains at column 4. The execute logic occurs after the decode state. It does, Your Honor. And the specification further explains at column 4, lines 2 through 4, and this is all a discussion about figure 3, that the instructions, that the native instructions, they're actually the output of the Java translator, which is upstream of the decoder. And if I may, to put it all in context, figure 3 shows it. If you look at, this is exhibit, this is the exhibit A that has all the, exhibit A to arm's reach where they all, has all the instructions highlighted. But if you look at figure 3, for example, you can see what the specification's talking about as it's explaining claim 30. It's talking about the Java instruction translator 42. It's feeding, it shows that the instructions are fed then to the instruction fetch. And then the instructions make their way to the instruction decode. And then after that, you can see the term instruction is no longer used. It doesn't say instruction execute logic. It says execute logic. So the patent... Well, instruction is used after 24A. Didn't the district court draw the line between the instruction fetch and the instruction decode? Your Honor, you're referring to 26A. Yes, I understand what you're saying. So that's where the district court drew the line. The district court drew the line where it matters because the instruction retains its pizza character, if you will, up to the point of instruction decode. And it is only after the instruction decode where the instruction no longer exists because it has lost its character, its control signal, that go to the AND gates, the NAND gates, the OR gates in the computer and implement the instruction. And that's what the execute unit is about. It's about implementing the instruction. And that's how the specification explains claim 30. And if I may, Your Honor, the other claim language that you pointed out is the language the word caused in claim 32 that also the zombie is relying on, and that's to point out those other main arguments. The judge found, Judge Folwell found, that the language in claim 30 where it talks about the register-based instructions causing the manipulation of the register file simply shows the downstream effect that the instruction... Well, no, I understand. I mean, I'm less troubled, frankly, by 32 because it does use the word cause, but claim 30 does not use the word cause. It does not, but it does not. But the specification, which tracks rather closely the language of a claim 30, claim 30 talks about the execute unit executing the register-based instructions, and, as I said, that really modifies the CPU by adding the execute unit. But that language is tracked rather closely by the specification of column 5, line 15, where it talks about the execute logic executing the instructions. So the specification, when read in context, tells us what the support is for claim 30. And as I was pointing to, column 4, lines 2 through 4 in the specification make clear that the instructions that the execute logic executes come from upstream of the decoder. They're the output of the instruction translator. We're not talking about instructions that somehow originate downstream. That's not what the specification is talking about. The specification consistently, without exception, in the claims as well, uses the term instruction as something that is input to the CPU's decoder, and it does not refer to instructions as something that is the output of the decoder. One thing I would like to just add, just by the way, there's all support for claim 30 in the specification at column 4, lines 46 through 54, where it talks about, in the specification, that the instructions from the translator operate on the values in the register file. And column 5, line 10, talks about the branch taken signal from the CPU in reference to the post-decode and post-execute commands, right? Column 5, line 10, your honor, it talks about... A little before where you cited this earlier, about the execute logic executing the native instructions. Yes, I was citing it to what Misomi was citing, and I'm reading it, and plus the JAVAX elevator instruction translate pipeline upon a branch taken signal from the CPU execute logic to use that signal. I see that. And I'm sorry, what was the question, your honor? Well, isn't that illustrating the point that you were making earlier about where we draw the line? Well, it would certainly be consistent with what I was saying, where you draw the line, which is instructions consistently throughout the patent, and the prosecution history, for that matter, as a trial court found, is used as an input to the CPU's decoder. And I'd like to just add here, we're not talking about, as Mr. Freeland said, somehow limiting the patent to specific environments. Yes, the patent talks about different environments, and we're not arguing that it's talking about different environments. It just so happens in patents that in this particular case, the patent consistently uses the term instruction to refer to the input of the CPU's decoder throughout the patent, throughout the claims, throughout all the environments, throughout the prosecution history. When Nozomi was writing this patent, it really was under an obligation to tell the public what the meaning is of the term instruction. If at the time, it had intended for the term instruction to have this broad meaning, Nozomi had an obligation to tell the public of that broad meaning. And it didn't. It didn't do it in the application. But you can see, it seems like the other side may be saying, though, that one skilled in the art would clearly understand instruction to have a broad meaning. Is your view that is true, but if you read the whole specification of claims in the context of this claim as a narrow meaning? Your Honor, they're actually entirely incorrect. The bulk of the extrinsic evidence, as we agreed, supports arms claim construction. One of ordinary skill in the art understands that the term instruction has a common ordinary meaning, and that is as an input to the CPU's decoder. We've addressed all the various extrinsic arguments that Nozomi has made, and typically when you dig deeper, you see that it is actually arms construction, sorry, I should say the trial court's construction that really prevails. And the trial court considered all of the extrinsic evidence. It considered all of the intrinsic evidence. Essentially, if you look at Nozomi's approach, what it's trying to do is it's trying to reinstate Texas digital, in effect. It's telling you, let's take these claims. Let's take this claim. Let's find the broadest possible meaning we can find. And now you, the public, have the burden of trying to find some sort of disclaimer in the specification that's as broad as possible meaning that they found in the abstract should apply here. And that's not the way you do claim construction. Certainly under Phillips, you are required to look at the context in which claim terms appear, and that's exactly what Judge Holt did. He didn't leave the claims in this vacuum, as he says. He put them in the context of the specification, and he recognized that in the context of the specification, what we're talking about, what this whole patent is always talking about is it's taking these instructions that are either provided by the output of a compiler or then provided by the translator, and they're provided to the input of the CPU. And that's what the patent talks about consistently throughout. That's what their concern was, which is why they never tried, never intended, never wanted to talk about instruction in a broader sense. They didn't need to. That's not what their invention was about. One, well, I just realized I'm out of time. If I may finish a point. The only thing, just in case it lingers, but on the cause point, as I was referring to in the specification, again, what it's talking about here, to put everything in context, what they can look at, at the language and the specification supports, plan 32, and you look at that and you will see, based on the slides that I gave you, that what we're talking about is, again, instructions that originate from the translator, in other words, upstream of the decoder, and only subsequently do they have this operational effect on the values in the register file, but they have to be decoded first by the instruction decoder. They have to change their character from that original pizza into control signals before that manipulation of the register file happens, and that's the explanation for claim 32, and that is how Judge Fogel understood the term instruction to be used consistently throughout the claims and throughout the specification in reference to the input of the CPC. Thank you. Arm's argument today is struck by one thing. We talked over and over again about assertive auditing. If you look at Column 2, all of the discussion, all of the examples that Arm pointed to were in the section that follows, that's titled Detailed Description of the Preferred Embodiments in Column 2. One thing we know, we have to guard against importing preferred embodiments into the claim. That wasn't done here. Figure 3, if you look at Figure 3, you will see the descriptions in the text talk about it as illustrating some of the details of a job of accelerator of one embodiment. That's at Column 2, lines 37 through 39. It's also referred to as one embodiment at Column 3, lines 66 and 67, and we are in danger of doing what the district court did, and that is importing those limitations. Step back. Ordinary meaning. I think there's really no dispute, although the opposing counsel seems to think that there is. This term, instruction, has a broad meaning. The court, curiously enough, didn't follow your instruction and tell us what that is, but I think it's pretty clear that, by implication, it was his own definition that was proposed below. There's a presumption under the Knifeman-Trex case that that's the meaning that should apply to the terms, and therefore, with this presumption, it has to be overcome. It can't be overcome by accounting exercise. You have to look at all of the intrinsic evidence. That wasn't done here. It wasn't done properly here. There are numerous parts in the intrinsic evidence which are inconsistent with the court's narrow instructions, such as Claims 30 and 32. The court offered an excuse. Oh, the inventor must have been imprecise. The judge even had to invent a new term, control signals, in order to come up with his definition. Not one the inventor used, not one that we adopted, not one that he defined. Maybe we have to now define what control signals are. When his narrow definition had the effect of limiting it to the disclosed embodiments, he said, oh, I don't need to worry about that. I'm going to reject any testimony that there might be potential other embodiments. Why is he rejecting? Because they're not disclosed. It's an illogical argument that he came up with. So he rejected all assistance from persons of ordinary skill, basically uncontradicted as to what the term means and as to other embodiments. There are other references in the spec that he found inconsistent. He says, oh, those are straight references. The point is that, yes, there's some support for the position the claim might be more narrow, but because of the presumption, it's not going to come because of all these inconsistencies. It would be wrong to rewrite the patent language. There's no clear intent on this record in this patent with this intrinsic evidence and also the author of extrinsic evidence that the claims are as narrow as the judge found them. So we ask this court to reverse this case,  Thank you very much for your time.